UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

97 NOV 14 AM 9:03

U.S. DISTRICT COURT
N.D. OF ALABAMA

PHYLLIS SHEPHERD,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )    Civil Action No. CV96-S-661-S
                                     )
ALABAMA POWER COMPANY,               )
                                     )    ENTERED
        Defendant.                   )
                                          NOV 1 7 1997

**MEMORANDUM OPINION**

Phyllis Shepherd claims defendant discriminated against her in
violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act
of 1964, 42 U.S.C. §§ 2000e *et seq*.   She alleges that she was
qualified for, but denied several promotions and grade increases
because of her race (African-American) and gender.   She asserts
those denials prompted her resignation, which she claims amounted
to a constructive discharge.   The action presently is before the
court on defendant's motion for summary judgment.   Upon
consideration of the pleadings, briefs, and evidentiary
submissions, the court concludes the motion is due to be granted in
part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Qualifications

Plaintiff graduated from the University of Alabama in
Birmingham during 1981 with a bachelors degree in chemistry.   She
initially was employed by Alabama By-Products Corporation,[1] where

---

[1]Plaintiff testified that she worked at Alabama By-Products for
approximately one year before she was laid off.   (Plaintiff's deposition at 20.)
She was recalled into a non-chemist position during a strike in June of 1983, and
returned to work as a chemist after the strike was settled.   (*Id*. at 21-22.)

48

she gained experience in "air monitoring and other types of environmental experience." (Plaintiff's deposition at 117.)

In April of 1984, Alabama Power Company hired her to work as a "chemical technician" in the water chemistry laboratory at its Gorgas Steam Plant. (*Id.* at 20-23; John Huguley deposition at 6.) At that time, a foreman supervised the water chemistry lab and the chemical technicians who worked there.[2] Plaintiff's duties included "water conditioning," sewage analysis, sewage plant maintenance, oil sampling & analysis, coal sampling & analysis, and "water plant operations." (Plaintiff's deposition at 31.)

During calendar year 1989, plaintiff received in-service training as a foreperson for approximately six months, but she was removed from the program prior to completion, because she allegedly failed to take advantage of the training opportunity. (Huguley deposition at 39; plaintiff's deposition at 173-74.)   While training, plaintiff assisted in weighing coal delivered to Gorgas Steam Plant, and in preparing paperwork required of foremen. (Plaintiff's deposition at 172.)   She claims her training gave her an understanding of labor contracts, because she received and read a copy of a labor agreement manual. (Plaintiff's affidavit at 2.) Plaintiff also claims she gained an understanding of plant operations during her tenure at the Gorgas Steam Plant: "The plant makes electricity. I understood how may [sic] workers there were, how many shifts, and how all the equipment — turbines, boiler feed

---

[2]The laboratory still has a foreman, but the employees now are "self-directed." (Huguley deposition at 6-7.)

2

pumps, condensate pumps, feed water heaters, etc., worked."
(Plaintiff's affidavit at 3.)  Finally, plaintiff alleges she was
familiar with fuel treatment procedures, and competent in water
treatment operations.  (Plaintiff's affidavit at 2.)

## B.    Promotion Claims

### 1.    Regulatory compliance specialist - August 1994

#### a.    Requirements for the job

Applications for a "regulatory compliance specialist" position
at Gorgas Steam Plant were solicited during August of 1994.[3] The
notice of job vacancy listed the following position requirements:

**Knowledge**
-    Formal education and/or experience in the physical
     sciences and/or biological sciences is highly
     desirable.
-    In-depth knowledge of and experience in power plant
     operations.
-    In-depth knowledge of the laboratory equipment used
     in performing environmental related testing.
-    Broad knowledge of environmental, OSHA and safety
     standards and regulations.
-    Technical background in utilization of personal
     computers and software, including VM/CMS.

**Skills**
-    Computer skills - the ability to understand
     personal computers and manipulate data to obtain
     desired results.
-    Excellent oral, written and organizational skills.
-    Interpersonal skills - ability to effectively
     interface with power generation personnel,
     personnel in other departments within the Company
     and various government agencies.
-    Ability to work effectively under pressure.

---

[3]The parties present no evidence demonstrating that the regulatory
compliance specialist position, or any other "promotional" opportunity claimed
by plaintiff, garnered improved hours, pay, duties, or prestige.  Even so,
defendants do not contend the positions were not promotions and the court
accordingly will review each claim under a failure to promote analysis.

-    Excellent planning skills in order to meet
     deadlines.

(Gary Laye[4] affidavit exhibit A.)

### b. Successful applicant: Marcus Knight

The regulatory compliance specialist position was awarded to Marcus Knight (a white male), formerly a senior regulatory compliance specialist.[5]  (Laye affidavit ¶ 3.)  Knight also was experienced in the positions of lab foreman and chemical technician in the Gorgas Steam Plant.  (*Id.*)  He holds associate and bachelor degrees in chemistry, and possesses knowledge and experience of power plants, OSHA standards, and environmental regulations.  (*Id.*)

### c. Reasons asserted for plaintiff's failure to receive promotion

Plaintiff applied for the position, but was not interviewed. (Plaintiff's deposition at 162.)  She simply received a memorandum from chemical and results superintendent Gary Laye informing her that Knight had been selected.  (*Id.* at 160-61.)  She did not talk to Gary Laye about the reasons for awarding the position to Knight, or for failing to promote her.  (*Id.* at 161-62.)  Even so, Laye previously had formed negative opinions of plaintiff's work performance which influenced the decision:

---

[4]Laye was chemical and results superintendent for the Gorgas Steam Plant, and he was involved in the decision to fill the regulatory compliance specialist position.  (Laye affidavit at ¶¶ 2,3.)

[5]The parties do not explain why Knight's move from "senior regulatory compliance specialist" to "regulatory compliance specialist" was considered a promotion.  For some reason, defendant claims that Knight's new position was actually "regulatory compliance analyst" (Laye affidavit ¶ 3), but the job listing for that position plainly states that the open position was "Regulatory Compliance Specialist I."  (*Id.* exhibit A.)

4

> My observations of Ms. Shepherd were that she did not take the initiative: she would do what her job technically required and no more. She was given the opportunity to expand her knowledge of power plants by working in the Results section, but she did not perform well. I also gave her the opportunity to substitute as the coal receiving foreman, but she again displayed a lack of initiative.
>
> . . .
>
> Based on my personal observations of Ms. Shepherd's performance as a chemical technician and her performance when given opportunities to expand her skills and level of knowledge, I did not feel that she was the best candidate for the senior regulatory compliance specialist position.

(Laye affidavit ¶¶ 4, 5.)

### 2. Senior regulatory compliance specialist - September 1994

#### a. Job description and criteria

When Marcus Knight assumed the regulatory compliance specialist position, his previous position as senior regulatory compliance specialist became vacant.[6]  Thus, an opening for that position was posted. The requirements for the position were the same as those listed above for the regulatory compliance specialist position.   (David Hollinger[7] affidavit exhibit A.)   The only apparent difference between the jobs was the supervisors: the senior regulatory compliance specialist reported to results superintendent Gary Laye, while the regulatory compliance specialist reported to technical manager David Hollinger.  (*Cf.*

---

[6]See note 5 *supra.*

[7]Hollinger was the technical manager for Gorgas Steam Plant at the time the senior regulatory compliance position was filled. The person in that position reported to Hollinger, and he assisted in screening applicants.

5

Hollinger affidavit exhibit A; Laye affidavit exhibit A.) When candidates for the position were screened, the requirements for the position were organized into the following categories: initiative; interpersonal skills; technical skills; organizational skills; and, writing skills. (Hollinger affidavit ¶ 4.) Plaintiff applied for the position but, again, was neither interviewed nor chosen.

### b. Successful applicant: Judson Richardson

Judson Richardson was selected for the position. He was plaintiff's immediate supervisor on the date the senior regulatory compliance position opened. (Hollinger affidavit ¶ 6.) "Richardson met the knowledge and skill requirements for the senior regulatory compliance position and ... demonstrated interpersonal skills superior to all of the other candidates." (*Id*. ¶ 7.)

### c. Explanations given to plaintiff for failure to receive promotion

On September 20, 1994, plaintiff received a memorandum from technical manager David Hollinger informing her that she had not been selected as one of the final five candidates for the position. (Hollinger affidavit exhibit B.) Two days later, plaintiff met with Hollinger to discuss the reasons she was not selected for promotion. (Plaintiff's deposition at 95.) Hollinger told her she needed to improve her interpersonal skills, and to become more candid and vocal. (*Id*. at 112-13.) Hollinger also told her to become a "self-starter," and to be more active in community affairs. (*Id*.) By affidavit, Hollinger testified that the following

6

opinions of plaintiff's performance and behavior influenced the screening process:

> (1) she did an adequate job in her position as Chemical Technician III; (2) she had not proven that she could work in an unstructured position that required significant personal initiative; (3) she did not take advantage of learning opportunities outside of her routine duties that would have strengthened her overall plant diversity; (4) she had been observed numerous times sleeping during safety and other work related meetings; (5) she had not demonstrated strong interpersonal skills, and was viewed as a loner who was distant to co-workers.

(Hollinger affidavit ¶ 5.)

### 3. Laboratory foreman - October 1994

#### a. Job description and criteria

The laboratory foreman position at Gorgas Steam Plant became vacant in October 1994. The opening was not posted, however. Therefore, plaintiff never applied. (Plaintiff's deposition at 180.) Nevertheless, defendant claims "the qualifications for the position of [laboratory foreman] include an engineering and technical knowledge of the plant and laboratory methods, experience in power plant operations, and laboratory analyses and the ability to communicate with personnel." (Affidavit of Robert E. Norman, Jr.[8] exhibit B.) "Overall knowledge of power plant operations and good communications skills were two of the major criteria used to decide who would fill the lab foreman vacancy." (Norman affidavit ¶ 5.)

---

[8]Norman is the plant manager for Gorgas Steam Plant.

7

### b.   Successful applicant:   Tom White

Prior to October of 1994, Tom White (a white male) was the "shift foreman" at Gorgas Steam Plant.   In that position, White gained experience in plant operations.[9]

> White's extensive experience in power plant operations made him a superior candidate for [the] lab foreman's position.  His work performance, communications skills, leadership abilities, and initiative, which are evidenced by his performance reviews, also established that he was more than qualified to perform the job of lab foreman.

(Norman affidavit at ¶ 4.)   At the time the laboratory foreman position became available, defendant also was in the process of eliminating White's shift foreman position, because of a corporate reorganization.   (Norman affidavit ¶ 3.)   Defendant maintains a policy of relocating employees when possible; therefore, White was placed in the laboratory foreman position.   (*Id.*)   That lateral move was neither a promotion nor an upgrade for White.   (White affidavit ¶ 2.)

### c.   Plaintiff's other evidence of discrimination

Plaintiff did not speak to any member of defendant's management regarding the failure to award her the laboratory foreman position.   (Plaintiff's deposition at 166.)   She nevertheless claims the failure was discriminatory, because she was the laboratory technician with the most seniority who wanted the

---

[9]In its brief, defendant alleges White gained "extensive experience in power plant operations" by holding the following positions prior to laboratory foreman: laborer, auxiliary operator, assistant turbine operator, assistant plant control operator, switchboard operator, engineering aide, and shift foreman. (Defendant's brief at 7 and n.2.)  The court's review of the record, however, only revealed evidence of the laboratory foreman, shift foreman, and engineering aide positions.

8

job.   She further alleges her qualifications were identical to former lab foreman John Huguley, and that Huguley only received that position in 1988, because he was one year more experienced than plaintiff.  Thus, plaintiff argues the same selection process should have led to her promotion to laboratory foreman in 1994.

## C.   Grade Claims

When defendant hired plaintiff in 1984, there were no job grade classifications, and plaintiff simply held the position of chemical technician.  By 1990, defendant instituted job grades, and plaintiff was made a chemical technician III.  From that position, plaintiff could increase her grade to chemical technician II or chemical technician I.[10]

### 1.   Criteria

To receive an upgrade from chemical technician III to chemical technician II, the following technical knowledge and skills were required:

- Thorough understanding of plant clearance procedures
- Knowledge of fuel procedures, test & equipment
- Demonstrated   knowledge   of   safe   work practices/policies & procedures
- Competency in waste water treatment
- Competency in water treatment plant operations
- Understanding of plant layout, plant systems
- Knowledge of plant performance parameters (Results)
- Understanding of Plant Cycles
- Competency   in   Laboratory   Skills:   equipment operation,   troubleshooting,   and   calibration; analytical testing; and laboratory procedures
- Understanding of plant organization

_____

[10]Again, the parties produce no evidence that a job grade increase was accompanied by an increase in pay or responsibilities.  Even so, they treat the job grade increase as a promotion, and the court will analyze plaintiff's claim under that theory.  (See note 3 supra.)

9

- Knowledge of Labor Contract
- Demonstrated knowledge of materials procurement and accounting practices, etc.
- Demonstrated knowledge of regulatory compliance
- Competency in boiler water chemistry (Startup & Shut-downs)

(Huguley deposition exhibit 7 at 3.) Plaintiff admits she received a copy of the document setting forth those requirements. (Plaintiff's deposition at 216-17.)

### 2. Rickey Bryant and Bruce Williams

In May of 1994, John Huguley reviewed the persons under his authority occupying the chemical technician III position, and elected to upgrade Rickey Bryant (a white male) and Bruce Williams (an African-American male) to chemical technician II.

### 3. Explanations given to plaintiff for failure to receive grade increase

Huguley based his upgrade decision on the employees' technical knowledge, skills, and work behavior. (Huguley deposition at 106.) Deficiencies in those areas were noted, and then discussed with the employees during their performance evaluations or a separate meeting. (*Id.*) During plaintiff's May 16, 1994 performance evaluation, Huguley discussed her alleged deficiencies as follows:

Using this technical knowledge and skills format, the things that Phyllis was deficient in were Knowledge of plant performance parameters, Understanding of plant cycles, Knowledge of labor contracts, Demonstrated knowledge of materials procurement and accounting practices, Demonstrated knowledge of Regulatory Compliance, Knowledge of fuel procedures tests and equipment, and Demonstrated analytical problem-solving skills, and Competency in Water Treatment Plant operation. In the work behavioral areas: Ability to coordinate and direct the work of others, Demonstration of individual initiative.

10

(Huguley deposition at 14.)

### 4. Other evidence relevant to grade increases

While Bryant and Williams were the only employees promoted to chemical technician II in May of 1994, Loretha Woods Bradford (an African-American female) was promoted from chemical technician III to chemical technician II in 1992. (Huguley deposition at 127-28.) Furthermore, all other lab employees in the chemical technician III position[11] were upgraded by Tom White to chemical technician II within six months of plaintiff's departure. (White affidavit ¶ 7; plaintiff's affidavit at 2.) Plaintiff's successor (African-American female Alicia Williams) already has been upgraded from chemical technician III to chemical technician II. (White affidavit ¶ 7.)

### D. Plaintiff's Resignation

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on October 11, 1994, and she presents no evidence of discrimination after that time. At approximately the same time, Tom White became plaintiff's laboratory foreman, and plaintiff described her relationship with him as "quite favorable." (Plaintiff's deposition at 194.) Plaintiff resigned from employment with defendant during June of 1995, and informed defendant she was leaving "to pursue other

---

[11]Arthur O'Mary (white male); Darcy Prince (African American male); Mike Slobe (white male). (White affidavit ¶ 4.)

11

endeavors." (Plaintiff's deposition at 36.)  In fact, she studied
for the Alabama bar exam.[12]  (*Id.* at 207-09.)

## E.  Alleged Direct Evidence of Discrimination

Plaintiff points to a variety of incidents occurring during
her employment as constituting direct evidence of discrimination.
Between 1987 and 1989, plaintiff allegedly found two hangman's
nooses, observed Ku Klux Klan symbols written in chalk on walls,
found Ku Klux Klan hoods, and observed the words "last thing
niggers see in hell ..." somewhere in the plant.  (Plaintiff's
affidavit at 1.)  Plaintiff did not report those alleged incidents
to management, however.  She explained her failure to do so as the
result of fear, and not knowing who to inform.  (*Id.*)

Plaintiff also accuses Gorgas Steam Plant management of
directly discriminating against her.   Allegedly, plaintiff's
supervisor for projects outside of the water chemistry laboratory,
John Mullins, "used the 'n' word frequently."  (*Id.*[13])  She further
alleges Mullins stated "he had to slap his wife because she got out
of line," and "that a woman's place is in the home."  (*Id.*)  Lab
foreman John Huguley allegedly inferred that she and a male
African-American employee were having a sexual affair.   (*Id.*)
Plaintiff further alleges Huguley talked to her in a condescending

---

[12]Plaintiff's first attempt in July of 1995 was not successful.

[13]During her deposition, however, plaintiff could identify only one
incident during which Mullins used "the 'n' word."  (Plaintiff's deposition at 51-
52.)  Plaintiff also argues Mullins advised John Huguley on the decision to
remove her from the foreman training program.  (Plaintiff's brief at 8.)  In
deposition, however, Huguley could only recall that Judson Richardson offered
input on that decision.  (Huguley deposition at 37.)

12

fashion, and made "demeaning comments," but did not treat male
employees in a similar manner. (*Id.*)  Plant manager Robert Norman
allegedly instructed her to perform more like Terry Craft, a white
male, in order to receive consideration for promotion.   (*Id.*)
Finally, plaintiff alleges "[t]he use of the 'n' word is commonplace
among the first line supervisors and co-employees." (*Id.*[14])

**F.   Other Evidence of Discrimination**

**1.   Promotion denials not presented in plaintiff's complaint**

Plaintiff claims she was not considered for several other
promotions in addition to those discussed above, and that her
omission from those opportunities is further evidence of
defendant's discriminatory attitude.   Allegedly, four people were
promoted to the position of regulatory compliance specialist
between 1986 and 1989,[15] but — in each instance — notice of the
vacancy (and solicitation of applications) was never posted.
(Plaintiff's affidavit at 3.)   Plaintiff also alleges she possessed
qualifications similar to those of John Huguley, who was promoted
to lab foreman in 1988, but she was not considered for the position
in 1994.  (Plaintiff's affidavit at 3.)   Finally, plaintiff notes
the general absence of African-Americans from the ranks of the
Gorgas Steam Plant's upper management.  (*Id.*)

---

[14]In deposition, however, the only supervisor plaintiff identified as using
"the 'n' word" was John Mullins.   (Plaintiff's deposition at 53-55.)

[15]John Huguley (white male) between 1986 and 1987; Alan Peeples (white
male) in 1988; Charles Howton (white male) between 1988 and 1989; and Debra Key
(white female) between 1988 and 1989.   (Plaintiff's affidavit at 3.)

13

## 2. Performance evaluations

Plaintiff attempts to rely upon her favorable performance evaluations to establish she was qualified for promotion and upgrade. Even so, none of the listed job descriptions make performance evaluations a component of the promotion process. Furthermore, John Huguley testified that evaluation scores were not used to determine eligibility for job upgrades. (Huguley deposition 96-97, 103-04.)

## II. DISPARATE TREATMENT

To prevail on a disparate treatment claim, plaintiff must prove the employer intended to discriminate against her. *See, e.g., Armstrong v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). The evaluation of evidence bearing on the employer's intent differs, depending upon whether the proof is direct or circumstantial in nature.

"When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996)(citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Haynes v. W.C. Caye and Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995)).

When a plaintiff establishes by direct evidence that a contested employment decision was motivated by a discriminatory

14

animus, the employer "may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender [race, religion, color, national origin, age, or disability] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989)(emphasis supplied). In other words, "defendant must prove that there was a separate, racially neutral [*i.e.*, non-discriminatory] reason for its" contested employment decision. *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir. 1990) (emphasis supplied).

## A. Direct Evidence

"[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990)(emphasis supplied). Stray statements or comments in the workplace do not constitute direct evidence of discriminatory motive. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)(O'Connor, J., concurring opinion); *Trotter v. Board of Trustees of the University of Alabama,* 91 F.3d 1449, 1454 (11th Cir. 1996); *Burns v. Gadsden State Community College,* 908 F.2d 1512, 1518 n.9 (11th Cir. 1990).

This court has reviewed the evidence plaintiff contends is direct evidence of discrimination and finds no correlation between those allegations and the alleged failure to promote her. Without a correlation between the discriminatory attitude reflected by

15

statements or comments and the disparate treatment complained of, the evidence cannot be considered "direct," and the court should not impose a direct evidence burden on defendant. *Caban-Wheeler*, 904 F.2d at 1555; *see also Merritt v. Dillard Paper Company*, 120 F.3d 1181, 1190-91 (11th Cir. 1991)(holding that statement "your deposition was the most damning to Dillard's case" is direct evidence of retaliation); *Haynes v. W.C. Caye & Company, Inc.*, 52 F.3d 928, 930 (11th Cir. 1995)(holding that statement questioning whether "sweet little old lady could get tough enough" to do job and statement that "a woman was not competent enough to do this job" constitute direct evidence of gender and age discrimination); *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir. 1990)(holding that statement that "no woman would be named to a B scheduled job" constitutes direct evidence of gender discrimination); *Caban-Wheeler*, 904 F.2d at 1555 (holding that defendant's statement that program needed a black director constitutes direct evidence of race discrimination); *E.E.O.C. v. Alton Packaging Corporation*, 901 F.2d 920, 923 (11th Cir. 1990)(holding that general manager's statement that "if it was his company, he wouldn't hire any black people" and production manager's statement that "you people can't do a ------- thing right" constitute direct evidence of race discrimination); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 n.3, 1072(11th Cir. 1990)(holding that plant manager's constant barrage of racial slurs and statements such as "[t]hose niggers out there will not get anywhere in this company" constitute direct evidence of race

16

discrimination); *Sennello v. Reserve Life Insurance Company*, 872 F.2d 393, 394, 395(11th Cir. 1989)(holding that statement that "we can't have women in management" constitutes direct evidence of gender discrimination); *Walters v. City of Atlanta*, 803 F.2d 1135, 1141-42 (11th Cir.1986)(holding that memorandum requesting a new list of candidates because "current register ... does not include any minority group representation" constitutes direct evidence of race discrimination); *Wilson v. City of Aliceville*, 779 F.2d 631, 633, 636 (11th Cir. 1986)(holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam nigger" constitutes direct evidence of race discrimination); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563 (11th Cir. 1985)(holding that college president's statement that he saw no reason for a woman to have a second job and statement that males had families and needs that female plaintiff did not constitute direct evidence of gender discrimination); *Miles v. M.N.C. Corporation*, 750 F.2d 867, 874-75 (11th Cir. 1985) (holding that plant manager's statement that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes direct evidence of race discrimination); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1553, 1557(11th Cir. 1983)(holding that supervisor's statement that he would not put woman in washerman position because "every woman in the plant would want to go into the washroom" constitutes direct evidence of gender discrimination).

17

**B.   Circumstantial Evidence**

On the other hand, when, as here, a Title VII plaintiff's evidence of discrimination is circumstantial in nature, the Supreme Court has developed a three stage framework for focusing the inquiry. *See McDonnell Douglas Corp. v. Green* , 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, plaintiff must establish a *prima facie* case, which in a failure to promote case requires proof that: (1) she belongs to a protected group; (2) she applied for, and was qualified for the position for which the employer was seeking applicants; (3) she was denied the promotion; and, (4) another equally or less qualified individual outside the protected class received the promotion. *Batey v. Stone*, 24 F.3d 1330, 1334 n.11 (11th Cir.1994)(citing *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989)).

If plaintiff establishes a *prima facie* case, thereby giving rise to a presumption of unlawful, disparate treatment, then at the second stage of analysis the burden of production shifts to defendant to rebut the presumption by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If defendant does so, then in the final step of the inquiry plaintiff must have an opportunity to show by a preponderance of the evidence that

18

defendant's stated reasons merely are pretexts for unlawful, discriminatory motives. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

In her complaint, plaintiff alleges defendant discriminated by failing to promote her to the positions of senior regulatory compliance specialist, regulatory compliance specialist, and laboratory foreman; and, by failing to upgrade her to chemical technician II. (Complaint ¶ 8.) Defendant moves for summary judgment on each of those claims, but plaintiff only responds to defendant's arguments concerning the laboratory foreman position and the failure to upgrade plaintiff:

> Plaintiff sues under Title VII and § 1981 alleging race and sex discrimination as the reason for her failure to be promoted to Laboratory Foreman (September 1994) and Upgrade to Chem II (July or August 1994).

(Plaintiff's brief at 1.)

Plaintiff's failure to respond to defendant's argument on the senior regulatory compliance specialist and regulatory compliance specialist positions requires that summary judgment be granted on those claims. *See Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995) ("Summary judgment is appropriate since Plaintiff failed to respond to [defendant's] argument on this issue"); *see also Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 n.4 (S.D. Ala. 1997); *Southern Nevada Shell Dealers Association v. Shell Oil*, 725 F. Supp. 1104, 1109 (D. Nev. 1989); *Valluzzi v. United States Postal Service*, 775 F. Supp. 1124, 1125 (N.D. Ill. 1991).

19

### 1.    Laboratory foreman

Defendant argues plaintiff cannot establish a *prima facie* case, because she cannot demonstrate her qualification for the position of laboratory foreman.    Defendant also asserts two allegedly legitimate, nondiscriminatory reasons for naming Tom White laboratory foreman: "(1) the desire to select a well-qualified person to fill the lab foreman vacancy, and (2) the desire to retain a valuable employee." (Defendant's brief at 8.)

### a.    Plaintiff's *prima facie* case - knowledge of power plant operations

Defendant claims plaintiff cannot demonstrate her qualifications for the laboratory foreman position, because she cannot prove her knowledge of power plant operations was equal to that of Tom White.    Nevertheless, subjective criteria should generally not be considered in the *prima facie* case.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997)(declining to examine plaintiff's job performance to determine qualifications); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3rd Cir. 1990)(subjective qualities are "better left to consideration of whether the employer's nondiscriminatory reason for discharge is pretext"). Thus, the court will not grant summary judgment on that basis, because defendant only relies upon its subjective perception of plaintiff's knowledge to challenge her *prima facie* case.

### b.    Plaintiff's comparative qualifications

The first reason advanced by defendant for failing to promote plaintiff to the laboratory foreman position is the same as its

20

attack on her *prima facie* case: plaintiff allegedly lacked the
"overall knowledge of power plant operations" possessed by Tom
White. (Defendant's brief at 8.) Plaintiff responds by asserting
that she possessed an adequate knowledge of plant operations:

> I was familiar with the operations of the plant. The
> plant makes electricity. I understood how may [sic]
> workers there were, how many shifts, and how all the
> equipment — turbines, boiler feed pumps, condensate
> pumps, feed water heaters, etc. worked. ... Nobody even
> asked me about my plant operations knowledge before they
> gave the job to Mr. White.

(Plaintiff's affidavit at 3.) Defendant offers no objective
evidence of the exact knowledge component for "powerplant
operations" required for the lab foreman position. Therefore,
plaintiff's statement is sufficient to create a genuine issue of
material fact regarding her knowledge of plant operations and
qualifications for the lab foreman position.

### b. Retention of a valuable employee

The second reason advance by defendant for failing to promote
plaintiff to the laboratory foreman position is best encapsulated
by the affidavit of Gorgas Steam Plant manager, Robert Norman, who
testified that Tom White, the person promoted over plaintiff:

> was laterally transferred to the lab foreman's position.
> The shift foreman's position that White held was being
> eliminated as part of a corporate reorganization and,
> pursuant to APCo's practice of relocating valuable
> employees whenever possible, the decision was made to
> move White to the lab foreman's position. White's
> transfer was neither an upgrade nor a promotion.
>
> ...
>
> White's extensive experience in power plant operations
> made him a superior candidate for [the] lab foreman's
> position. His work performance, communications skills,

21

> leadership abilities, and initiative, which are evidenced
> by his performance reviews, also established that he was
> more than qualified to perform the job of lab foreman.

(Norman affidavit ¶¶ 3, 4.)    On the basis of that testimony,
defendant asserts in brief that: "White was transferred to the
position because (1) his job was being eliminated, (2) APCo has a
practice of trying to retain valuable employees displaced by
reorganization, and (3) he was qualified to perform the
responsibilities of lab foreman." (Defendant's brief at 8.)

Plaintiff concedes the first two prongs of defendant's
argument, but denies that White was qualified to perform the
responsibilities of lab foreman.

> Tom White was simply not qualified for the job. He got
> the job because of a restructuring in the plant left him
> without a job. The job calls for a chemistry degree and
> the ability to perform laboratory analysis and have a
> technical knowledge of laboratory methods. He had none
> of these things. He was simply a foreman for bargaining
> unit labor — plant control operators, assistant plant
> control operators, helpers (clean up people). ... Before
> becoming a shift foreman, Tom White was a bargaining unit
> employee working in operations.

(Plaintiff's affidavit at 3.)  While plaintiff incorrectly lists a
chemistry degree as a qualification for the position, the ability
to perform laboratory analysis and technical knowledge of
laboratory methods were requirements, and there is no evidence
White satisfied those requirements.

Even so, plaintiff's burden on rebuttal is "to come forward
with evidence, including the previously produced evidence
establishing the *prima facie* case, sufficient to permit a
reasonable factfinder to conclude that the reasons given by the

22

employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). Plaintiff produces no evidence demonstrating that defendant's policy of reassigning employees was not the "real reason" for White's placement in the lab foreman position. In fact, plaintiff acknowledges that White "got the job because [] a restructuring in the plant left him without a job." (Plaintiff's affidavit at 3.) While White's qualifications may have been lacking in some respects, "Title VII does not require an employer to hire or promote the most qualified applicant; it only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin." *McCarthney v. Griffin-Spalding County Board of Education*, 791 F.2d 1549, 1552 (11th Cir.1986). Plaintiff does not allege White "got the job because of his race or sex," but that he "got the job because of a restructuring in the plant....."

Plaintiff also asserts pretext, based upon defendant's alleged failure to follow its criteria in filling the lab foreman position. She alleges she and John Huguley possessed similar qualifications in education and experience, but that Huguley was awarded the lab foreman position in 1988, because he possessed one year greater seniority. Hence, she believes she was the natural choice to fill that position when Huguley vacated it in 1994. That allegation does nothing to question defendant's policy of reassigning valuable employees whose job positions were to be eliminated by a reorganization. Thus, there is no genuine issue of material fact

23

regarding the reason that White received the position, and defendant is entitled to summary judgment on that claim.

### 2. Job Grade Claims

Defendant raises the same defenses to plaintiff's job grade claims as it raises to all other claims: plaintiff was not qualified for a step-increase because she did not meet the criteria for upgrade; and, plaintiff cannot rebut defendant's legitimate nondiscriminatory reason.

#### a. Qualifications for the job

Defendant alleges the criteria for upgrade were both subjective and objective. (Defendant's brief at 13-14.) This court's review of those criteria, however, reveals only subjective factors: every factor in determining upgrade requires "understanding," "knowledge," or "competency." (Huguley deposition exhibit 7 at 3.) Subjective criteria are suspect, because they are "ready conduits" for discrimination. *Hill v. Seaboard Coast Line Railroad Company*, 885 F.2d 804, 809 (11th Cir. 1989). Furthermore, the complete use of subjective criteria (rather than a mix of objective and subjective criteria) provides a sufficient basis to depart from the qualifications requirement of the *McDonnell Douglas prima facie* case. *Id.*; *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300, 1314-17 (5th Cir. 1980)(where employer used "skill" requirement as basis for promotion, "all plaintiffs who sought work assignments in and promotion to the next [level] proved themselves *prima facie* qualified"). Thus, the court rejects defendant's

24

qualifications argument, and finds plaintiff has presented sufficient evidence to establish a *prima facie* case.

### b. Legitimate, nondiscriminatory reason

Defendant's legitimate, nondiscriminatory reason for failing to upgrade plaintiff is "Huguley's perception that she did not meet the criteria for upgrade for chemical technician III to chemical technician II ..." (Defendant's brief at 14.) A "perception" is a completely subjective basis for refusing upgrade. Thus, this court cannot accept defendant's nondiscriminatory reason, if it "is so subjective as to be incapable of objective evaluation." *Hill v. Seaboard Coast Line Railroad Company*, 885 F.2d 804, 809 n.7 (11th Cir. 1989); *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1011 (11th Cir. 1984). Huguley found:

> the things that Phyllis was deficient in were Knowledge of plant performance parameters, Understanding of plant cycles, Knowledge of labor contracts, Demonstrated knowledge of materials procurement and accounting practices, Demonstrated knowledge of Regulatory Compliance, Knowledge of fuel procedures tests and equipment, and Demonstrated analytical problem-solving skills, and Competency in Water Treatment Plant operation. In the work behavioral areas: Ability to coordinate and direct the work of others, Demonstration of individual initiative.

(Huguley deposition at 106-07.) "A standard known only to the employer and interpreted only by the employer could nevertheless be clear, specific and capable of objective evaluation, so long as the standard could be applied by a factfinder after the [employment decision] has taken place and the standard revealed." *Conner v. Fort Morgan Bus Company*, 761 F.2d 1495, 1499 (11th Cir. 1985). The court believes a factfinder could review the evidence in this case

25

and apply the standards used by Huguley. Thus, defendant has met its burden, and plaintiff must come forward with some evidence demonstrating that defendant's reasons are unworthy of credence.

### c. Plaintiff's evidence of pretext

Plaintiff presents sufficient evidence to fulfill her burden of demonstrating pretext. By affidavit, she states:

> Huguley never asked me anything about plant performance parameters and plant cycles. He has no way of knowing what I know about those areas. I do understand labor contracts because I was a substitute foreman and was given an IBEW labor agreement manual by Mr. Huguley, which I read. He never examined me or quizzed me on it at all. There is no way that Mr. Huguley could know what my knowledge was in this area. I was the one who ordered most of the lab supplies and materials. Mr. Huguley never asked me about my regulatory compliance knowledge, nor did he give me a test of any kind, or send me to a seminar. I was familiar with fuel treatment procedures. I was excellent in analytical problem-solving skills. I was competent in water treatment operations.

(Plaintiff's affidavit at 2.) That statement explicitly contradicts Huguley's testimony, and questions his personal knowledge of the matters to which he testified. Thus, the court finds plaintiff "has put on sufficient evidence to allow a factfinder to disbelieve [defendant's] proffered explanation for its actions ...," and summary judgment will not be granted on the upgrade claim. *Benson v. Tocco, Inc.* 113 F.3d 1203, 1207 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997).

### III. CONSTRUCTIVE DISCHARGE

To prove constructive discharge, plaintiff must establish her working conditions were so intolerable that a reasonable person in

26

her position would feel compelled to resign. *Kilgore v. Thompson & Brock Management*, 93 F.3d 752, 754 (11th Cir. 1996). All she does, however, is assert that she "became so utterly discouraged by the failure of any job advancement in spite of her best efforts due to discrimination, she resigned." (Plaintiff's brief at 23.)

That argument relies exclusively on the failure to promote as the basis for plaintiff's constructive discharge claim. A simple failure to promote, however, cannot form the basis for a constructive discharge. Otherwise, "every person passed over for a purportedly deserved promotion could bring an illegal discharge suit, and the distinction between [promotion and discharge claims] would be erased." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996); *see also Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 495 (8th Cir. 1996)("frustration and embarrassment at not being promoted do not make work conditions sufficiently intolerable"); *Wardwell v. School Board of Palm Beach County*, 786 F.2d 1554, 1557–58 (11th Cir. 1986)(frustration and embarrassment resulting from a failure to promote did not create intolerable burden); *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990)("A failure to promote does not in and of itself result in constructive discharge").

Defendant also argues that plaintiff's working conditions were not intolerable at the time of her resignation, because she made a "better-than-average salary," and, she admittedly enjoyed a good relationship with her supervisor, Tom White. (Defendant's brief at 17–18.) This court agrees that plaintiff's working conditions were not "intolerable," and concludes summary judgment is appropriate on the constructive discharge claim.

27

## IV.   CONCLUSION

For the foregoing reasons, the court concludes defendant's motion for summary judgment is due to be granted with regard to plaintiff's claims for failure to promote to the following positions: regulatory compliance specialist; senior regulatory compliance specialist; and, lab foreman.  Defendant's motion also is due to be granted on plaintiff's constructive discharge claim. Nevertheless, defendant's motion for summary judgment is due to be denied with regard to plaintiff's claims for failure to upgrade to the position of chemical technician II.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this the 14th day of November, 1997.

_____
United States District Judge